J-S35008-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KEITH CARVELL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EDWARD D. JONES & CO., L.P., | : | |
| D/B/A EDWARD JONES | : | |
| INVESTMENTS; ART AMUNDSEN, | : | No. 713 MDA 2022 |
| FINANCIAL ADVISOR; GINA BELL, | : | |
| SR. OFFICE ADMINISTRATOR; AND | : | |
| ESTATE OF KURT M. MATTER, | : | |
| DECEASED, BY STEPHANIE A. | : | |
| KROSNAR, ADMINISTRATOR | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF EDWARD D. JONES & | : | |
| CO., L.P., ART AMUNDSEN, AND | | |
| GINA BELL | | |

Appeal from the Order Dated April 12, 2022
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2021-CV-05931-CV

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:               **FILED FEBRUARY 10, 2023**

Edward D. Jones & Co., L.P. ("Edward Jones"), Art Amundsen, Financial

Advisor ("Mr. Amundsen"), and Gina Bell, Sr. Office Administrator ("Ms. Bell")

(collectively, "Appellants") appeal from the portion of the April 12, 2022 order,

which denied their preliminary objections in the nature of a petition to compel

arbitration of the crossclaims of the Estate of Kurt M. Matter, deceased ("the

_____

[*] Former Justice specially assigned to the Superior Court.

Estate"). After careful review, we are constrained to reverse this portion of the trial court's order and remand for arbitration proceedings.

We glean the following relevant facts and procedural history from the record. Kurt M. Matter ("Mr. Matter" or "the deceased") died intestate on April 2, 2020, with no surviving spouse, children, siblings, or parents. Estate's Brief at 4. On July 9, 2020, an estate was opened for the deceased, to which his cousin, Stephanie A. Krosnar, was appointed as the administrator ("Administratrix"). *Id.* Shortly before his death, Mr. Matter inherited several Edward Jones financial accounts from his late sister, Karen Storm. *Id.*[1] On July 22, 2020, Edward Jones's senior office administrator, Ms. Bell, informed the Estate that Mr. Matter had not listed any beneficiaries to any of his accounts. *Id.*

> In reviewing Mr. Matter's personal effects, the attorneys for the Estate came across an incomplete and unsigned Edward Jones Beneficiary Form.[2] The form contained Keith Carvell's[2] name, phone number, address[,] and social security number. The Beneficiary Form was for only one of Mr. Matter's accounts. [It] contained miscellaneous handwritten writings from unknown person(s) and was unsigned and undated. Upon finding the form, the Estate contacted Edward Jones on July 29, 2020, to inquire as to whether Edward Jones would accept the form. [Ms.] Bell …

---

[1] Specifically, Mr. Matter inherited the following three investment accounts from his sister, which he continued to maintain with Edward Jones up until his death: an individual retirement account (account no. XXX-XX234-1-2); an individual account (account no. XXX-XX494-1-5); and another individual account (account no. XXX-XX146-1-5) (collectively the "accounts"). Appellants' Brief at 8.

[2] Keith Carvell was a purported friend of the deceased and is the plaintiff in the underlying action.

advised the Estate that the form was not valid and that [Edward Jones] would not accept it. Ms. Bell further confirmed to the Estate that Mr. Matter had no beneficiaries and had made no attempts to name a beneficiary for his accounts.

*Id.* at 4-5 (citations to record omitted).

Accordingly, at the direction of the Estate, Edward Jones distributed the funds in the deceased's accounts to his Estate. Appellants' Brief at 4. However, Mr. Carvell purports to have been Mr. Matter's "best friend" and believes that he is the rightful beneficiary of these accounts. *Id.* Although the Beneficiary Form was incomplete and was never submitted to Edward Jones prior to Mr. Matter's passing, Mr. Carvell avers that, at the very least, it identifies him as the intended beneficiary and that such identification entitles him to the funds formerly held in the accounts. *Id.* at 5.

On November 22, 2021, Mr. Carvell filed an amended complaint, naming the Estate, Edward Jones, Mr. Amundsen, and Ms. Bell as defendants.[3] In his complaint, he alleged that Mr. Matter clearly stated his intention to name Mr. Carvell as beneficiary of his accounts prior to his death and that Edward Jones was aware of this intent. Amended Complaint, 11/22/21, at ¶¶ 38-39.[4] He further averred that, despite its knowledge regarding Mr. Matter's intent and the steps taken by Mr. Matter to name Mr. Carvell as the beneficiary, Edward Jones liquidated and distributed the funds in the accounts to the Estate. *Id.* at ¶ 43. Based on the foregoing, Mr. Carvell asserted that the Beneficiary

---

[3] Mr. Amundsen and Ms. Bell are both employed by Edward Jones.

[4] Mr. Carvell attempted to obtain a copy of the Beneficiary Form to no avail. *Id.* at ¶¶ 28-31, 34, 36, 45-46, 50.

Form grants him a claim to the Estate. *Id.* at ¶ 51. Hence, he brought the following claims against Appellants and the Estate: Count I – Conversion against the Estate; Count II – Conversion against Appellants; Count III – Negligence against Appellants; Count IV – Fraud against the Estate. *Id.* at 10-15.

In Counts I and II, Mr. Carvell averred that, as the beneficiary, he was entitled to possession and ownership of the funds in the Edward Jones accounts, and that Appellants deprived him of this right by making an unauthorized transfer of the funds to the Estate. *Id.* at ¶¶ 56, 66, 70, 73. Likewise, he asserted that the Estate took unauthorized possession of the funds. *Id.* at ¶ 60. Thus, Mr. Carvell concluded that both the Estate and Appellants improperly converted assets belonging to him. *Id.* at ¶¶ 63, 74. In Count III, Mr. Carvell asserted that, "[Appellants] owed [him] a duty to account for the funds in the Edward Jones [a]ccounts and [to] properly transfer the funds[,]" *id.* at ¶ 79, and that Appellants violated this duty "by transferring the funds to [the] Estate without fully vetting and assessing the status of the Beneficiary Form[,]" *id.* at ¶ 81, and "by liquidating and distributing the funds … to [the] Estate." *Id.* at ¶ 82.

Finally, Count IV alleged that "the Beneficiary Form is complete or substantially and sufficiently complete to reflect the wishes of [the deceased;]" however, the Estate knowingly made false statements to Appellants and to Mr. Carvell indicating that the form is incomplete and invalid, with the intention that other parties, including Appellants and Mr. Carvell,

- 4 -

would rely on those statements. *Id.* at ¶¶ 87-88, 90-93. Indeed, Mr. Carvell stated that he did rely on the Estate's misrepresentation and that he delayed legal action to his detriment. *Id.* at ¶ 94. He further averred that Edward Jones relied on the Estate's misstatement in its transferring of the funds from Mr. Matter's accounts to the Estate and that, as a result, Mr. Carvell suffered damages. *Id.* at ¶¶ 95-96.

On December 23, 2021, the Estate filed an answer to the amended complaint with new matter and crossclaims, in which it confirmed that Ms. Bell had indicated to the Estate that the Beneficiary Form was invalid, and that Mr. Matter had never designated — or attempted to designate — a beneficiary to any of his Edward Jones accounts. *See* Estate's Answer, New Matter, & Cross Claims, 12/23/21, at ¶ 123. It further averred that, at no time, did anyone at Edward Jones indicate to the Estate that Mr. Carvell was the "intended or actual beneficiary" for the accounts. *Id.* at ¶ 124. The Estate maintained that it is "the proper legal owner of all Edward Jones accounts formally owned by the [d]ecedent[,]" as it acted in good faith, relying on representations made by Edward Jones, in directing the liquidation and transferring of the funds. *Id.* at ¶¶ 130, 132.

Additionally, the Estate asserted the following crossclaims against Appellants: Count I – Negligence; Counts II & III – Negligent Supervision and Training; Count IV – Breach of Fiduciary Duty; and Count V – Fraud. *Id.* at ¶¶ 133-204. In their negligence claim, the Estate averred that Appellants owed it a duty of care and that they breached that duty when they:

a. communicated with [Mr. Carvell], his counsel[,] and other third parties without authorization from [the] Estate regarding [the d]ecedent's … [a]ccounts[;]

b. disclosed to [Mr. Carvell], his counsel[,] and other third parties, confidential communication between [the d]ecedent and/or [the] Estate with Edward Jones and its employees[;]

c. discussed confidential information regarding [the d]ecedent and [his] Estate with [Ms.] Bell's husband[;]

d. intentionally misrepresented to [Mr. Carvell] alleged communications they had with [the d]ecedent before his passing[;]

e. failed to disclose to [the] Estate or legal counsel conversations [they] allegedly had with [the d]ecedent[,] which would call into question whether there would be a beneficiary to [his] accounts[;]

f. failed to disclose to [the] Estate the alleged existence of a "previously signed beneficiary" form with [Mr. Carvell's] name[;]

g. intentionally withheld information [they] had which the … Estate needed to properly evaluate whether there was a beneficiary for any of [the d]ecedent's accounts[;]

h. permitted [Ms.] Bell to falsify information which caused [Mr. Carvell] to believe he was entitled to [Mr. Matter's] Edward Jones accounts[;] and

i. told [the] Estate unequivocally that there were no beneficiaries to [the d]ecedent's accounts, while at the same time telling [Mr. Carvell] that he was the intended beneficiary.

*Id.* at ¶¶ 138-39.

Moreover, the Estate averred that Edward Jones, by and through its employees, Mr. Amundsen and Ms. Bell, acted intentionally and with malice when it

withheld information it had which the … Estate needed in order to evaluate whether there was a beneficiary for any of [the

- 6 -

d]ecedent's Edward Jones accounts[;] … permitted [Ms. Bell] to falsify information which caused [Mr. Carvell] to believe he was entitled to inherit [the d]ecedent's Edward Jones accounts[; and] relayed to [the] Estate unequivocally that there were no beneficiaries to [the d]ecedent's Edward Jones accounts, while at the same time relaying to [Mr. Carvell] that he was the "intended beneficiary."

*Id.* at ¶¶ 141-43. It further claimed that Edward Jones, through its employee, Ms. Bell, made the following false, negligent, and reckless statements: "[The d]ecedent presented Edward Jones with a signed beneficiary form with [Mr. Carvell's] name on it[;] and … [the d]ecedent told [Ms.] Bell, Mark,[5] and Lisa Coyne[6] that it was [the d]ecedent's intention that everything go to [Mr. Carvell.]" *Id.* at ¶ 144. The Estate averred that Appellants' breach of their duty caused it actual damages in excess of $50,000.00, in the form of inheritance tax incurred on the accounts, as well as legal fees and costs for litigation regarding the ownership of the accounts. *Id.* at ¶¶ 140, 148.

In its negligent supervision and training claims, the Estate asserted that Edward Jones had a duty to exercise ordinary care in its supervision and training of its employees—namely, Mr. Amundsen and Ms. Bell—and that it breached this duty when it failed to properly supervise and train them. *Id.* at ¶¶ 150-51. Similarly, the Estate maintained that Mr. Amundsen had a duty to exercise ordinary care in his supervision and training of his employee, Ms. Bell, and that his failing to supervise Ms. Bell with respect to all matters

---

[5] Based on our cursory review, "Mark" is not identified any further in the record.

[6] Lisa Coyne is the attorney who handled the estate of Karen Storm, Mr. Matter's sister. Amended Complaint at ¶ 13.

pertaining to the administration of the Edward Jones accounts was a breach of this duty. *Id.* at ¶¶ 164-65. It further contended that Mr. Amundsen and Ms. Bell committed the wrongful acts as enumerated in the Estate's negligence claim during their course of and within the scope of their employment with Edward Jones and that the Estate suffered actual damages as a result of Edward Jones's and Mr. Amundsen's failure to exercise reasonable care in their training and supervision of their employees. *Id.* at ¶¶ 152-54, 167-69.

In its next claim, the Estate declared that Appellants owed a fiduciary duty to Mr. Matter and that, by virtue of his death, Appellants owed a fiduciary duty to the Estate. *Id.* at ¶¶ 179-80. It further averred that, despite a duty of care and duty of loyalty owed to the Estate, Appellants communicated with Mr. Carvell and his counsel, without the Estate's authorization, regarding Mr. Matter's accounts, as well as confidential communications that Mr. Matter and/or the Estate had with Appellants. *Id.* at ¶¶ 181-82. The Estate asserted that Appellants breached their fiduciary duty by failing to act in the Estate's best interest, by disclosing confidential information to Mr. Carvell, intentionally misrepresenting to Mr. Carvell alleged communications they had with Mr. Matter before his death, and failing to disclose to the Estate certain conversations they had with Mr. Matter, which would call into question whether there would be a beneficiary to Mr. Matter's accounts, and the alleged existence of a previously signed beneficiary form. *Id.* at ¶¶ 183-90.

Finally, in its fraud claim, the Estate contended that Appellants made material misrepresentations of fact when communicating with the Estate

regarding Mr. Matter's accounts, and that such misrepresentations were done with the knowledge of their falsity and with the intent that the Estate would rely on them. *Id.* at ¶¶ 198-200. Moreover, reliance on these false statements caused actual damages to the Estate in an amount in excess of $50,000.00. *Id.* at ¶¶ 201, 204.

On December 14, 2021, Appellants filed preliminary objections to the amended complaint on the grounds that Mr. Carvell was required to arbitrate his claims pursuant to a valid, binding arbitration agreement. Appellants' Brief at 7. *See also* Pa.R.Civ.P.1028(a)(6) (providing that preliminary objections may be filed by any party to any pleading on the basis of an agreement for alternative dispute resolution); *Id.* at Note ("An agreement to arbitrate may be asserted by preliminary objection…."). In the alternative, they objected to the amended complaint under Rule 1028(a)(4), for failure to state a claim. Appellants' Brief at 7. On January 13, 2022, Appellants filed separate preliminary objections to the Estate's crossclaims pursuant to Rule 1028(a)(6), arguing that the Estate was also required to arbitrate its crossclaims against them based on a valid, binding arbitration agreement. *Id.* at 7-8.

In support of their preliminary objections, Appellants explained that the "Account Agreements" for each of the decedent's Edward Jones accounts contain an "Account Authorization" incorporating the full Edward Jones account agreement for the respective type of account and an acknowledgment that each contains a binding arbitration provision. *Id.* at 8. The Account

Agreements for individual retirement accounts and individual accounts each contain the following identical, arbitration provision:

> Any controversy arising out of or relating to any of [Mr. Matter's] account(s) from its inception, business, transactions or relationships [Mr. Matter has] now, had in the past or may in the future have with [Edward Jones], its current and/or future officers, directors, partners, agents, affiliates and/or employees, this Agreement, or to the breach thereof, or transactions or accounts maintained by [Mr. Matter] with any of [Edward Jones's] predecessor or successor firms by merger, acquisition or other business combinations shall be settled by arbitration in accordance with the [Financial Industry Regulatory Authority ("FINRA")] Code of Arbitration Procedure rules then in effect.

Appellants' Preliminary Objections to the Estate's Crossclaims ("Preliminary Objections"), 1/13/22, at Exhibit 4 (Account Agreement at 6, ¶17(a)) ("Arbitration Agreement").[7]

Moreover, Appellants asserted that "Mr. Matter intended to bind his Estate, any beneficiaries, and any personal representative or administrators of the Estate, to all aspects of the Account Agreement, including the … arbitration provision," Appellants' Brief at 9, as evidenced by the following language contained in the Account Agreements:

> *Binding Effect, Death, Incompetence, Disability, Succession.*
>
> **This Agreement** supersedes any prior agreement of the parties, and its terms **shall be binding upon my** heirs, **beneficiaries**, **personal representatives**, agents, **estate**, **executors**, successors, **administrators**, assigns, trustees and conservators

---

[7] Numerous Account Agreements are relevant to the instant dispute, each containing its own, separately executed arbitration provision. Because these arbitration provisions are identical to one another in both form and substance, we refer to the provisions collectively herein as a singular "Arbitration Agreement."

("Successors") **as to all matters involving my Account with [Edward Jones], including, but not limited to, the terms relating to arbitration**.

Preliminary Objections at Exhibit 4 (Account Agreement at 6, ¶14(g)) (emphasis added).

Likewise, Appellants asserted that the Administratrix agreed to arbitrate any disputes in connection with the Edward Jones account that she opened on behalf of the Estate after Mr. Matter's death, by executing a fiduciary account authorization and agreement ("Fiduciary Agreement"). Appellants' Brief at 9-10. The Fiduciary Agreement incorporated an Account Agreement and included an acknowledgement that the incorporated Account Agreement contains a binding arbitration provision. *Id.* at 10. The arbitration provision incorporated into the Fiduciary Agreement signed by the Administratrix is identical to the Arbitration Agreement contained in the Account Agreements signed by Mr. Matter. *Id.*[8]

After hearing oral argument on Appellants' preliminary objections, the trial court issued a single order on April 12, 2022, in which it ruled on both sets of objections. First, having determined that neither Mr. Carvell's nor the Estate's claims against Appellants fall within the scope of the relevant Arbitration Agreement, the trial court denied Appellants' Rule 1028(a)(6) objections to the amended complaint and the Estate's crossclaims. *See* Trial Court Order ("TCO"), 4/12/22, at 1-2 ¶1. Additionally, the trial court granted

_____

[8] Because the Fiduciary Agreement incorporates language identical to the Account Agreements signed by Mr. Matter, we refer to these agreements collectively throughout as the "Account Agreements."

the objections in the nature of a demurrer as to the amended complaint, and it dismissed Mr. Carvell's claims against Appellants. ***See id.*** at 2-4 ¶¶2-4. As such, the only claims that remain pending against Appellants are the Estate's crossclaims.[9]

On May 12, 2022, Appellants filed a timely notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Pursuant to Rule 1925(a)(1), the trial court indicated that its April 12, 2022 order adequately addressed the issues raised on appeal and, thus, it did not intend to file an additional opinion.

Herein, Appellants raise the following questions for our review, which we address together for ease of disposition:

1. Did the trial court err by denying arbitration of the … Estate's crossclaims against … Appellants?

2. Did the trial court err by concluding that the … Estate's crossclaims against … Appellants fell outside the scope of the binding [A]rbitration [A]greement between … Appellants and [the] decedent[, Mr.] Matter?

3. Did the trial court err by concluding that the … Estate's crossclaims against … Appellants fell outside the scope of the binding [A]rbitration [A]greement between … Appellants and the … Estate?

Appellants' Brief at 3.

Preliminarily, we recognize that an order overruling preliminary objections is, generally, an interlocutory order and unappealable. ***In re***

---

[9] Mr. Carvell's claims against the Estate are also still pending but are not at issue in this appeal.

*Estate of Atkinson*, 231 A.3d 891, 897 (Pa. Super. 2020); *Griest v. Griest*, 183 A.3d 1015, 1021-22 (Pa. Super. 2018). "The law is clear, however, that an order overruling preliminary objections that seek to compel arbitration is an interlocutory order appealable as of right pursuant to 42 Pa.C.S. § 7320(a)(1) and Pa.R.A.P. 311(a)(8)." *Estate of Atkinson*, 231 A.3d at 897 (citations omitted). *See also* Pa.R.A.P. 311(a)(8) ("An appeal may be taken as of right and without reference to Pa.R.A.P. 341(c) from … [a]n order that is made final or appealable by statute or general rule, even though the order does not dispose of all claims and of all parties."); 42 Pa.C.S. § 7320(a)(1) ("An appeal may be taken from … a court order denying an application to compel arbitration made under section 7304 (relating to proceedings to compel or stay arbitration)."). Accordingly, we determine that we have jurisdiction over this appeal.

We further acknowledge that each of the Account Agreements executed by the parties "contain identical governing law provisions, which expressly provide that 'the parties' respective rights and duties[] shall be governed by the laws of the State of Missouri.'" Appellants' Brief at 10 (citation omitted). Nevertheless, the parties do not allege that Missouri substantive law with respect to interpreting arbitration provisions differs from Pennsylvania's law. In fact, Appellants assert that there is "no legally significant distinction between the laws of Pennsylvania and Missouri with respect to [the same] and[,] thus[,] no conflict of law is presented." *Id.* at 10 n.3. Accordingly, we will apply Pennsylvania substantive law in our analysis of this case. *See ADP,*

- 13 -

*Inc. v. Morrow Motors Inc.*, 969 A.2d 1244, 1246 n.2 (Pa. Super. 2009) (applying the forum state's substantive law where neither party raised a choice-of-law issue or alleged a substantive difference between the laws of the forum state and the laws of the state which the parties chose to govern their "master service agreement").

Additionally, we note that Pennsylvania's Rules of Civil Procedure apply here. *See Sheard v. J.J. DeLuca Co., Inc.*, 92 A.3d 68, 76 (Pa. Super. 2014) ("As a general rule, the law of the chosen forum governs all procedural matters."); *ADP, Inc.*, 969 A.2d at 1246 n.2 ("[C]hoice of law analysis only applies to conflicts of substantive law. Whenever Pennsylvania is the chosen forum state for a civil action, our state's procedural rules, *i.e.*, the Pennsylvania Rules of Civil Procedure, govern, no matter what substantive law our courts must apply in resolving the underlying legal issues.") (internal citation omitted).

Thus, in reviewing the merits of Appellants' claims, we apply the following standard and scope of review:

> Our review of a claim that the trial court improperly denied the appellant's preliminary objections in the nature of a petition to compel arbitration is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition.
>
> In doing so, we employ a two-part test to determine whether the trial court should have compelled arbitration. First, we examine whether a valid agreement to arbitrate exists. Second, we must determine whether the dispute is within the scope of the agreement.
>
> …

Whether a claim is within the scope of an arbitration provision is a matter of contract, and as with all questions of law, our review of the trial court's conclusion is plenary.

*Griest*, 183 A.3d at 1022 (citation omitted). "The scope of arbitration is determined by the intention of the parties as ascertained in accordance with the rules governing contracts generally." *Smay v. E.R. Stuebner, Inc.*, 864 A.2d 1266, 1273 (Pa. Super. 2004). "Both Pennsylvania and federal law impose a strong public policy in favor of enforcing arbitration agreements." *Estate of Atkinson*, 231 A.3d at 898 (citation omitted). "Accordingly, if a valid agreement to arbitrate exists and the dispute falls within the scope of the arbitration agreement, the dispute must be submitted to arbitration and the lower court's denial of arbitration must be reversed." *Id.* (citations omitted).

Based on our review of the record, Appellants have established that Mr. Matter entered into a valid Arbitration Agreement, which is binding on the Estate. *See* Preliminary Objections at Exhibit 4 (Account Agreement). Appellants have also established that the Administratrix entered into a separate, valid Arbitration Agreement on behalf of the Estate in connection with the Estate's Edward Jones account. *See* Preliminary Objections at Exhibit 5 (Fiduciary Agreement). Moreover, there is no dispute over the existence or validity of the Arbitration Agreements. *See* TCO at 2 ¶1; Appellants' Brief at 13 (stating that "the parties … have acknowledged the validity of the [A]rbitration [A]greement[] and likewise do not dispute that it is binding on them"); Estate's Brief at 10 ("The Estate does not dispute that there is a valid

[A]rbitration [A]greement….").  Thus, we are satisfied that the first prong of the test for determining whether arbitration should have been compelled has been met.

Next, we address whether the Estate's crossclaims are within the scope of the Arbitration Agreement.  In doing so, we are further guided by the following principles:

> (1) arbitration agreements are to be strictly construed and not extended by implication; and (2) when parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive assurance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute.
>
> To resolve this tension, courts should apply the rules of contractual constructions, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.
>
> Where a contract dispute arises between parties to a contract containing an unlimited arbitration clause, the parties must resolve their dispute through arbitration.  Unless the parties impose some limitation on the arbitrator's authority, the arbitrator may decide all matters necessary to dispose of any disputed claims subject to arbitration and, the court may not impose any restrictions *sua sponte*.  Accordingly, "all" contract disputes does mean "all" contract disputes unless otherwise agreed by the parties.

***Callan v. Oxford Land Development, Inc.***, 858 A.2d 1229, 1233 (Pa. Super. 2004) (internal citations and quotation marks omitted).

Instantly, the trial court concluded that the Estate's crossclaims fall outside the scope of the Arbitration Agreement and, therefore, denied

Appellants' request to compel arbitration.  TCO at 2 ¶1.  In support of its

decision, the trial court explained:

> Although this is a broad arbitration provision, we find that it does
> not encompass the issues in the present case, which involve the
> question of whether or not [Mr. Carvell] should receive the
> proceeds of the Edward Jones account(s) that had been held by
> Mr. Matter prior to his death.  Thus, the dispute does not arise out
> of or relate to the accounts themselves.  Rather, it relates to the
> relationship between [Mr. Carvell] and Mr. Matter, and whether
> Mr. Matter intended to provide for [Mr. Carvell] after he died.  For
> these reasons, we find that the claims brought by [Mr. Carvell]
> and the crossclaims brought by [the] Estate against [Appellants]
> fall outside of the scope of the arbitration provision.  As such, we
> will not compel arbitration.

***Id.***[10]

Appellants argue that the trial court erred in denying their request to

compel arbitration of the Estate's crossclaims, as these claims clearly fall

within the scope of the Arbitration Agreement.  In support of their argument,

they aver:

---

[10] While the trial court presents the foregoing explanation as the basis for its decision to deny arbitration of both Mr. Carvell's claims against the Estate and the Estate's crossclaims, its reasoning only applies to Mr. Carvell's claims, which have been dismissed and are, therefore, no longer relevant in this matter.  ***See id.*** (stating that the dispute "relates to the relationship between [Mr.Carvell] and Mr. Matter, and whether Mr. Matter intended to provide for [Mr. Carvell] after he died"); ***contra*** Appellants' Brief at 15 (noting that the Estate's crossclaims "charge that … Appellants are separately and independently liable to [the Estate] for alleged acts and omissions committed with respect to Mr. Matter's accounts following his death" and have nothing to do with Mr. Carvell's relationship with the deceased).  The trial court fails to shed light on its reasoning for finding that the Estate's crossclaims do not fall within the scope of the Arbitration Agreement.  Nevertheless, our scope of review is plenary; thus, this omission does not impede our review.

[T]he factual and legal bases of each crossclaim both "arise out of" and "relate to" Mr. Matter's accounts. Indeed, the … Estate's crossclaims confirm as much, referencing Mr. Matter's … accounts over forty (40) times. Each crossclaim alleges that Edward Jones—as the "account holder for [Mr. Matter's] investments"— owed the … Estate several duties of care. [] Appellants allegedly breached those duties when they: communicated with [Mr. Carvell] … without authorization from [the] Estate regarding Mr. Matter's … [a]ccounts; intentionally withheld information it had which the … Estate needed to properly evaluate whether there was a beneficiary for any of Mr. Matter's accounts; failed to disclose to [the] Estate or legal counsel conversations it allegedly had with Mr. Matter which would call into question whether there would be a beneficiary to Mr. Matter's accounts; and caus[ed Mr. Carvell] to believe he was entitled to [the funds in] Mr. Matter's … accounts….

The crossclaims both "arise out of" and "relate to" Mr. Matter's accounts[] and[, thus,] there … can be no doubt that they fall squarely within the scope of the [A]rbitration [A]greement.

*Id.* at 17-19 (citations to record, some paragraph breaks, and some internal brackets omitted).

The Estate counters that the trial court was correct in denying Appellants' request to compel arbitration, as "even broad arbitration clauses will not encompass every possible dispute between the parties." Estate's Brief at 15. The Estate insists that its crossclaims "do not relate to the accounts themselves[] but[,] rather[,] to misrepresentations, omissions[,] or errors made by [Edward Jones's] employees[,]" and that these "are not the type of claims the parties intended to submit to arbitration when they executed their agreements." *Id.* at 18. Alternatively, the Estate argues that its claims fall outside the scope of the Arbitration Agreement because they consist of tort

claims which are independent of the underlying contract terms agreed upon by the parties. *Id.* at 19. For the following reasons, we agree with Appellants.

Giving paramount importance to the intent of the parties, we look to the language of the Arbitration Agreement, which states, in relevant part:

> **Any controversy arising out of or relating to any of [Mr. Matter's] account(s) from its inception, business, transactions or relationships [Mr. Matter has] now, had in the past or may in the future have with [Edward Jones], its current and/or future officers, directors, partners, agents, affiliates and/or employees, this Agreement, or to the breach thereof**, or transactions or accounts maintained by [Mr. Matter] with any of [Edward Jones's] predecessor or successor firms by merger, acquisition or other business combinations **shall be settled by arbitration** in accordance with the FINRA Code of Arbitration Procedure rules then in effect.

Preliminary Objections at Exhibit 4 (Account Agreement at 6 ¶17(a)) (emphases added).

Based on the plain language of the Arbitration Agreement, we believe the parties intended to include not only any controversy arising out of or relating to the Account Agreement and/or the breach thereof, but also any dispute arising from or relating to Mr. Matter's and/or the Estate's accounts, business dealings, and relationships with Edward Jones and its employees. No limitations have been imposed by the parties to exclude certain types of disputes from arbitration, nor have the parties imposed any temporal restrictions. *See id.* (including all accounts, business, transactions, and relationships that Mr. Matter "[has] now, had in the past or may in the future have with [Edward Jones]"). We cannot imagine any broader language. *See*

- 19 -

*Provenzano v. Ohio Valley General Hosp.*, 121 A.3d 1085, 1096 (Pa. Super. 2015) ("A 'broad' arbitration clause in a contract is one that is unrestricted, contains language that encompasses all disputes which relate to contractual obligations, and generally includes 'all claims arising from the contract regardless of whether the claim sounds in tort or contract.'").

In fact, we deem the language contained in the Arbitration Agreement to be "unlimited," as it is just as broad — if not more expansive — than general arbitration provisions requiring "any controversy arising out of or relating to" a contractual agreement or the breach thereof to be settled by arbitration, which have long been viewed by our courts as unlimited arbitration clauses. *See Borough of Ambridge Water Authority v. Columbia*, 328 A.2d 498, 501 (Pa. 1974) (declaring that a provision stating "any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration" consists of "the broadest conceiving language from which it must be concluded that the parties intended the scope of the submission to be unlimited"); *Smay*, 864 A.2d at 1274 (concluding that an arbitration clause, which provides "[a]ny controversy or [c]laim arising out of or related to the [c]ontract, or the breach thereof, shall be settled by arbitration[,]" is "unlimited" and "encompasses all disputes that relate to a contractual obligation"). "Where … there is an unlimited arbitration clause, **any** dispute which may arise between the parties concerning the principal contract is to be settled pursuant to its terms." *Ambridge*, 328 A.2d at 501 (emphasis added). *See also Callan*, 858 A.2d at 1233 ("Where a contract

dispute arises between parties to a contract containing an unlimited arbitration clause, the parties **must** resolve their dispute through arbitration.") (emphasis added).

Here, the Estate's crossclaims are premised on Appellants' alleged breach of duties it claims Appellants owed to the Estate. These alleged duties stem from the Account Agreements signed by the parties and from Edward Jones's role as the holder of the accounts for Mr. Matter and the Estate. We fail to see how claims regarding the breach of duties arising from the Account Agreements themselves, the mishandling of confidential information pertaining to the accounts, and/or the failure to disclose pertinent information regarding a potential beneficiary to the accounts can be viewed as falling "outside the scope" of the Arbitration Agreement. **See** TCO at 2 ¶1. **See also Saltzman v. Thomas Jefferson University Hospitals, Inc.**, 166 A.3d 465, 477 (Pa. Super. 2017) (quoting **Provenzano v. Ohio Valley General Hosp.**, 121 A.3d 1085, 1096 (Pa. Super. 2015) ("[W]here the arbitration provision is a broad one, and '[i]n the absence of any express provision excluding a particular grievance from arbitration, … only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'")). Thus, we conclude that the trial court erred in finding that the Estate's crossclaims are not encompassed by the broad language of the Arbitration Agreement.

Moreover, we reject the Estate's argument that its crossclaims fall outside the scope of the Arbitration Agreement to the extent that they consist of tort claims. **See** Estate's Brief at 19. It is well-settled:

An agreement to arbitrate disputes arising from a contract encompasses tort claims where the facts which support a tort action also support a breach of contract action. A claim's substance, not its styling, controls whether the complaining party must proceed to arbitration or may file in the court of common pleas.

*Callan*, 858 A.2d at 1233 (internal citations omitted).

As we have previously explained,

[t]his Court has consistently compelled the arbitration of tort claims arising from a contractual relationship where the language of the arbitration clause is broad and unlimited. *See, e.g.*, *Callan*, 858 A.2d at 1234 (holding that tort claim arising from real estate sales contract was subject to arbitration); *Warwick Twp. Water and Sewer Auth. v. Boucher & Jaines, Inc.*, 851 A.2d 953, 958 (Pa. Super. 2004) ("[G]iven the broad scope of the arbitration language which provides that arbitration is to be the preferred means to resolve all claims arising out of or relating to the contract documents, it was improper for the trial court to rule that the arbitration provision does not apply to the negligence claim."); *Pittsburgh Logistics Sys., Inc. v. Prof'l Transp. and Logistics, Inc.*, 803 A.2d 776, 779 (Pa. Super. 2002) (holding that tort action for misappropriation of trade secrets, breach of common law fiduciary duties, and interference with contractual relationship was within the scope of parties' broad arbitration agreement).

*Saltzman*, 166 A.3d at 478-79. *See also Pittsburgh Logistics Sys., Inc.*, 803 A.2d at 780 (citing *Shadduck v. Christopher J. Kaclik, Inc.*, 713 A.2d 635, 638-39 (Pa. Super. 1998) (explaining that the *Shadduck* Court concluded all claims were covered by unlimited arbitration agreement after determining the factual averments of the tort claims underlie the breach of contract claims and therefore are not temporally or factually distinct)).

In the instant matter, the Arbitration Agreement is broadly worded and there is no evidence demonstrating the parties' intent to exclude tort claims

arising from or relating to the Account Agreements or from the Estate's business, transactions, or relationships with Appellants. Additionally, we conclude that the facts averred in the Estate's tort claims also support a breach of contract action; neither is temporally or factually distinct. ***See Callan***, ***supra***; ***Pittsburgh Logistics Sys., Inc.***, ***supra***. We are convinced that the parties intended to submit all of their grievances to arbitration, regardless of whether they sounded in tort or contract.

Accordingly, we reverse the portion of the trial court's April 12, 2022 order denying Appellants' preliminary objections in the nature of a petition to compel arbitration of the Estate's crossclaims and direct the trial court to compel arbitration of said claims.

Order reversed in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/10/2023