J-A17024-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MARY DILORETO, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF RICHARD DILORETO  AND CINDY RAUENZAHN, EXECUTRIX OF THE ESTATE OF FAITH PLATT AND KATHLEEN BOYER AND MARYELLEN BYRNE, CO-EXECUTRIXES OF THE ESTATE OF THERESA M. HASSINGER AND PATRICIA MARSINI AND IRENE KALMAN AND  FRANCES LAY AND STEPHANIA MOORE, EXECUTRIX OF THE ESTATE OF ROSALIE ZUBYK AND JANET MICHELS, EXECUTRIX OF THE ESTATE OF SUSAN F. BRODERICK AND JOAN L. LORGUS, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF ROBERT A. LORGUS | : : : : : : : : : : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br>No. 2395 EDA 2022 |
| v. | : : : : | |
| BARCLAY FRIENDS AND JOHNSON CONTROLS FIRE PROTECTION, LP F/K/A SIMPLEX GRINNELL, LP | : : : : : : | |
| APPEAL OF: BARCLAY FRIENDS | : | |

Appeal from the Order Entered August 30, 2022
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  191101072

| CINDY RAUENZAHN, INDIVIDUALLY | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| AND AS THE EXECUTRIX OF THE | : | PENNSYLVANIA |
| ESTATE OF FAITH PLATT | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BARCLAY FRIENDS, THE KENDAL | : | No. 2797 EDA 2022 |
| CORPORATION, AND JOHNSON | : | |
| CONTROLS FIRE PROTECTION, LP | : | |
| F/K/A SIMPLEX GRINNELL, LP | : | |

Appeal from the Order Entered October 20, 2022
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 220302711

BEFORE:  KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.:                    **FILED NOVEMBER 17, 2023**

Barclay Friends ("Barclay") takes these consolidated appeals from the orders overruling its preliminary objections and refusing to compel arbitration in the above captioned cases.[1]  We reverse in part, vacate the orders, and remand these matters to the trial court.

Barclay operates a senior living complex in West Chester, Pennsylvania. In 2017, a fire ("the fire") destroyed Barclay's personal care annex known as the Woolman Building ("the Woolman").  Appellees are former residents, or representatives of the estates of former residents, of the Woolman

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Barclay takes these appeals as of right from the interlocutory orders refusing to enforce or compel arbitration.  **See** Pa.R.A.P. 311(a)(8); **see also** 42 Pa.C.S.A. §§ 7320(a)(1), 7321.29(a)(1), 7342(a) (discussing rights to appeal order denying motions to compel arbitration).

(collectively, "appellees"). Appellee Mary DiLoreto ("DiLoreto"), individually and as executrix of the estate of Richard DiLoreto, is the lead plaintiff at docket 191101072 ("the DiLorteo action"). Appellee Cindy Rauenzahn ("Rauenzahn"), individually and as executrix of the estate of Faith Platt, is the plaintiff at docket 220302711 ("the Rauenzahn action").[2]

Appellees allege that the fire started on the back patio of the Woolman, spread up the Woolman's vinyl siding, and engulfed the building. *See e.g.* Complaint, 191101072, 11/8/19 ("the DiLoreto complaint"), ¶¶ 21-27. The fire, they assert, started and spread due to Barclay's failures to enforce its no-smoking policy, maintain a proper flow of water to the Woolman's sprinkler systems, and ensure the Woolman's fire suppression systems were in working condition. *See id*. ¶ 32.[3] They claim the former residents suffered injuries caused by the fire, smoke inhalation, and their evacuation from the Woolman. *See id*. ¶¶ 65-69, 71. Those injuries, they continue, contributed to the deaths of some of the former residents. *See id*. ¶¶ 65-69.

The DiLoreto complaint, filed in November 2019, asserted counts against Barclay for negligence (count I), reckless and outrageous conduct

---

[2] The DiLoreto action originally included a total of eight plaintiffs, including Faith Platt, a former resident of the Woolman who subsequently passed away. Rauenzahn then filed a separate complaint in her own right and on behalf of Faith Platt's estate.

[3] In their joint brief, appellees assert that the fire started when a Barclay employee threw an unextinguished cigarette into a trash can outside of the Woolman. *See* Appellees' Brief at 1.

(count III), wrongful death (count V), survival (count VI), damages specific to former residents or their estates (counts VII through XIV), and damages to property (count XV). DiLoreto sought compensatory damages and punitive damages due to Barclay's reckless indifference to the health and safety of the former residents. *See id*. ¶¶ 47, 65-69.

Barclay filed preliminary objections in August 2022, and, among other issues, moved to compel arbitration. *See* Preliminary Objections (DiLoreto action), 8/2/22, ¶¶ 22-23, 35. Barclay asserted all former residents in the DiLoreto action signed an admission agreement ("the Agreement"),[4] which contained the following provisions:

> This AGREEMENT is made as of [date] between [the resident] ("you" or "your"), currently residing at [address] and Barclay Friends ("we" or "us" or "Barclay"), a Pennsylvania nonprofit corporation, located at 700 N. Franklin Street, West Chester, PA, which owns and operates **a licensed personal care facility** known as "Woolman." **We agree to provide Personal Care services to you and you agree to pay for those services pursuant to the terms of this Agreement**. Admission to Woolman does not assure admission to any other level of care at Barclay nor does admission confer to you the rights of a tenant under Pennsylvania law. . . .
>
> * * * *

---

[4] Barclay attached to its preliminary objections copies of the admissions agreements signed by the former residents, except two, which it could not locate and presumed had been destroyed in the fire. It appears that the former residents signed one of several different admissions agreements, one designated as form number 2142270v8. As used in this decision, the Agreement refers to the first copy of form number 2142270v8 in Exhibit B to Barclay's preliminary objections to the DiLoreto complaint. We have redacted the name and other identifying information contained on that copy.

**2. Description of Services and Rates**

*(a) Accommodation.  We will make available Room # \_\_\_\_ in Woolman, commencing on [date].*

*(b) Services.  The following basic services are included in the daily rate:*

*(i) Room*.

\* \* \* \*

(iv) Housekeeping, **maintenance of Barclay Friends' property,** utilities (except personal phone).

\* \* \* \*

**17. Damage to Property**

You will pay us, or the appropriate party, for the cost of repair, restoration or replacement of any damage done to our property or that of any other person's property by you, your guests, agents, invitees or anyone who is visiting you for any purpose.  Only we may make repairs to our property.

**18. Release**

You agree that we shall not be liable for any loss, injury or damage to you or your property, **not caused by our negligence**, including without limitation, any loss, damage or injury to you or your property caused by your negligence or the negligence of your family, other residents, guests or agents, and any damage **from fire** or other casualty.

\* \* \* \*

**29. Successors**

All rights and liabilities herein given to or imposed upon the respective parties hereto shall extend to and be binding upon the several heirs, legal representatives, successors and assigns of the parties to this Agreement.

\* \* \* \*

### 33. Choice of Law

This Agreement shall be deemed to have been made and shall be construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania.

### 34. Arbitration of Disputes

***Any controversy or claim arising out of, or relating to, this Agreement, or the breach thereof***, will be settled by arbitration, which will be binding upon both parties.

\* \* \* \*

### 39. Binding Upon Resident's Estate

This Agreement may be enforced as a claim against your estate, whether or not you resided with us at the time of your death.

***See*** Agreement, Preamble & ¶¶ 2, 17-18, 29, 33, 34, 39 (emphases added).

The Agreement further provided that the former residents understood the Agreement and the Agreement contained all terms and conditions governing the relationship between Barclay and the former resident. ***See id***. ¶ 42.

Barclay argued the DiLoreto complaint stated claims that fell within the broad language of the agreement to arbitrate. ***See*** Memorandum of Law in Support of Preliminary Objections (DiLoreto action), 8/2/22, at 2; ***see also*** Agreement, ¶ 34. Barclay further claimed that by signing the Agreement, the former residents bound their estates, heirs, legal representatives, successors,

and assigns. ***See*** Memorandum of Law in Support of Preliminary Objections (DiLoreto action), 8/2/22, at 2; ***see also*** Agreement, ¶¶ 29, 39.

DiLoreto responded the former residents had not agreed to arbitrate claims related to the fire because the Agreement lacked any express terms discussing fire or fire safety. ***See*** Memorandum of Law in Opposition to Preliminary Objections (DiLoreto action), 8/16/22, at 31-34. DiLoreto also asserted it would violate public policy to enforce an agreement to arbitrate where a defendant acted recklessly. ***See id***. at 35. DiLoreto generally denied, but did not specifically respond to or argue against, Barclay's assertion the former residents bound their estates and heirs to the terms of the Agreement. ***See*** Response in Opposition to Preliminary Objections (DiLoreto action), 8/16/22, at 13.

On August 30, 2022, the trial court, with the Honorable Jacqueline Allen presiding, overruled Barclay's preliminary objections and denied Barclay's request to compel arbitration in the DiLoreto action. The court held that the DiLoreto complaint stated claims which did not fall within the scope of the Agreement. ***See*** Trial Court Opinion (DiLoreto action), 10/17/22, at 4. Barclay timely appealed. Barclay and the trial court complied with Pa.R.A.P. 1925.

Meanwhile, in March 2022, Rauenzahn filed a separate complaint ("the Rauenzahn complaint"), which was substantially similar to the DiLoreto complaint. Barclay filed preliminary objections, including a request to compel

arbitration based on the Agreement. Rauenzahn filed a response similar to DiLoreto's. On October 20, 2022, the trial court, with the Honorable Linda Carpenter presiding, overruled the preliminary objection to compel arbitration and held that Judge Allen's August 30, 2022 order established the law of the case.[5] Barclay timely appealed. The trial court did not order a Rule 1925(b) statement. This Court consolidated Barclay's appeals in the DiLoreto and Rauenzahn actions.

> Barclay raises the following issue for review:
>
> Whether the trial court erred by overruling Barclay['s] preliminary objections to [DiLoreto's and Rauenzahn's c]omplaints, where those preliminary objections sought to transfer the case to private arbitration pursuant to the contractual agreement executed by the parties requiring that any controversy or claim arising out of, or relating to, the agreement be resolved by binding arbitration?

Barclay's Brief at 5 (some capitalization omitted).

This Court's review of an order denying a request to compel arbitration "is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition." *Carvell v. Edward D. Jones & Co., L.P.*, 294 A.3d 1221, 1230 (Pa. Super. 2023) (internal citation omitted). This Court applies a two-part test to determine whether a party is entitled to compel arbitration:

---

[5] *See Heart Care Consultants, LLC v. Albataineh*, 239 A.3d 126, 132 (Pa. Super. 2020) (noting that pursuant to the coordinate jurisdiction rule, which this Court has described as an aspect of the law of the case doctrine, "a trial court judge may generally not alter the resolution of a legal question previously decided by another judge of the court") (internal citation omitted).

(1) whether a valid agreement to arbitrate exists; and (2) whether the claims fall within the scope of the arbitration agreement. *See id*.

Here, the parties do not dispute the validity of the Agreement or the arbitration provision. Therefore, we focus on the trial court's ruling that appellees' claims did not fall within the scope of the agreements signed by the former residents.

The scope of an arbitration agreement is a matter of contract, which implicates questions of law. *See id*. This Court's standard of review is *de novo*, and the scope of our review is plenary. *See id*.

The following principles govern the interpretation of an arbitration clause:

> (1) arbitration agreements are to be strictly construed and not extended by implication; and (2) when parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive assurance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute. . . . [C]ourts should apply the rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.

*Humphrey v. GlaxoSmithKline PLC*, 263 A.3d 8, 13 (Pa. Super. 2021) (internal citation omitted). "Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and

unequivocal, its meaning must be determined by its contents alone."
***Maisano v. Avery***, 204 A.3d 515, 520 (Pa. Super. 2019).

Barclay contends that it was entitled to compel arbitration of all claims against it because paragraph 34 of the Agreement contained broad language requiring arbitration of "***[a]ny*** controversy or claim arising out of, or relating to" the Agreement. ***See*** Barclay's Brief at 19 (citing Agreement, ¶ 34) (emphasis added). Barclay notes that courts have construed similar language as requiring parties submit all grievances, whether sounding in tort or contract, to arbitration. ***See id***. at 19-20.[6]

Barclay acknowledges neither the Agreement nor the arbitration clause explicitly referred to causes of action related to its negligence and gross negligence or to fire safety and fire suppression systems at the Woolman. Barclay notes that a contract need not detail all types of possible occurrences causing damages to a party. ***See id***. at 19. The Agreement, Barclay contends, included terms for its provision of residential services, accommodations, and maintenance of its property. ***See id***. at 17. Barclay further asserts Pennsylvania law governs the interpretation of the Agreement and thereby incorporates Barclay's duties as a licensed personal care home to comply with Pennsylvania regulations requiring fire safety training. ***See id***.

---

[6] Barclay also extensively argues that public policy favors arbitration. ***See*** Barclay's Brief at 13-16. However, the mere existence of an arbitration clause and the policy favoring arbitration does not require a finding that all disputes are subject to arbitration. ***See Adams v. Mt. Lebanon Operations, LLC***, 276 A.3d 1203, 1206 (Pa. Super. 2022).

- 10 -

at 18-19 (citing Agreement, ¶ 33; 55 Pa. Code §§ 2600.01-2600.270).

Barclay adds that other provisions in the Agreement required residents to

release Barclay from responsibility for certain damages and pay for damages

to Barclay's property. **See id**. at 17-18 (citing Agreement, ¶¶ 17-1818).

Barclay concludes that it "defie[d] logic" for the trial court to assert "that

claims arising out of a fire at the property which [was] the subject of the

Agreement [did] not fall under the scope" of the Agreement and its arbitration

clause. **Id**. at 18.

The trial court explained it overruled Barclay's request to enforce the

Agreement's arbitration clause because "the facts of this case [were] outside

the scope of the [Agreement]." Trial Court Opinion (DiLoreto action),

10/17/22, at 4. The court reasoned:

> While there are various statutes, ordinances, and
> regulations that mandate [Barclay's] compliance with health and
> safety requirements, the arbitration provision [was] limited to
> "[a]ny controversy or claim arising out of, or relating to this . . .
> Agreement." There [was] nothing in the . . . Agreement that
> require[d Barclay] to provide a safe, fire-free environment. There
> [was] nothing in the . . . Agreement that [Barclay would] supply
> water to the sprinkler system. There [was] nothing in the . . .
> Agreement that the sprinkler system [would] be in working
> condition. There is nothing in the . . . Agreement that [Barclay]
> [was] responsible for providing a means of safe egress in case of
> a fire.

**Id**. at 4. The court emphasized the Agreement's release of responsibility

clause applied only to injuries and damages from fires **not** caused by Barclay's

negligence and the Agreement did **not** create a landlord-tenant relationship

between Barclay and a resident. *See id*. at 1-2 (citing Agreement, Preamble & ¶¶ 17-18).

Following our review, we are constrained to conclude the trial court erred when interpreting the Agreement and the scope of the arbitration clause. The trial court construed the Agreement as limited solely to the provision of a room and accommodations for a fee, without any requirement that Barclay provide a "safe, fire-free environment." *See id*. at 4. The Agreement affirmatively established that Barclay owned and operated a "*licensed* personal care facility known as 'Woolman.'" Agreement, Preamble (emphasis added). The Agreement clearly stated that the former residents agreed to pay for services, including a room and accommodations at the Woolman, a licensed personal care facility. *See* Agreement, Preamble & ¶ 2(a)-(b) (describing "[s]ervices and [r]ates" as including accommodations by making available a room in the Woolman by a certain date and defining "services" as including the provision of a room). The Agreement further provided that Barclay was solely responsible for the maintenance of its property. *See id*. ¶¶ 2(b)(iv) (noting that Barclay's "services and rates" included its maintenance of its property), 17 (stating only Barclay could make repairs to its property).

Licensure, as argued by Barclay, required the Woolman to meet numerous requirements intended to protect the health, safety, and well-being of residents, including requirements related to fire safety and emergency

planning. **See** 62 P.S. § 1001-1088 (governing licensing); 55 Pa. Code §§ 2600.1 (stating general purpose of regulations governing personal care homes), 2600.14 (related to fire safety approval), 2600.107 (related to emergency preparedness), 2600.121-2600.133 (related to fire safety).[7] Barclay could not expressly waive these regulatory requirements by contract with a resident; nor could the trial court ignore these requirements simply because the Agreement did not expressly refer to each and every regulatory provision. **Cf**. **Liss & Marion, P.C. v. Recordex Acquisition Corp.**, 937 A.2d 503, 512 (Pa. Super. 2007) (noting "[t]he laws that are in force at the time the parties enter into a contract are merged with the other obligations that are specifically set forth in the agreement") (citations omitted). Indeed, no person can maintain, operate or conduct a personal care facility without having a license issued from the Department of Human Services, **see** 61 P.S. § 1002, and in order to obtain and maintain a license for a personal care facility in Pennsylvania, a facility must meet over two hundred substantive regulations. Twenty-eight of those regulations govern a personal care home's physical site, **see** 55 Pa. Code §§ 2600.81 -2600.109, twelve regulations deal with fire safety, **see** 55 Pa. Code §§ 2600.121-133, and there are two catch-all provisions requiring fire safety approval, **see** 55 Pa. Code. §§ 2600.14, and

---

[7] The regulations also discuss use of tobacco pursuant to a facility's policies. **See** 55 Pa. Code § 2600.144.

compliance with "applicable Federal, State and local law, ordinances, and regulations." 55 Pa. Code. § 2600.18.

Thus, the trial court's limited interpretation of the Agreement failed to give effect to the term "licensed" as stated in the Agreement. We cannot conclude that parties carelessly chose or simply ignored this term. *See Maisano v. Avery*, 204 A.3d at 520. Giving the term "licensed" its natural and probable meaning, we conclude the essence of the bargain between Barclay and the former residents was for the provision of a room and accommodations subject to the extensive safety regulations governing licensed personal care facilities in Pennsylvania.[8] The trial court's reasoning

_____

[8] We note the trial court's reasoning in this case mirrored this Court's decision in *Setlock v. Pinebrook Pers. Care & Ret. Ctr.*, 56 A.3d 904 (Pa. Super. 2012). In *Setlock*, this Court affirmed the denial of a personal care facility's request to compel arbitration of claims related to the facility's negligence when transporting a resident to an offsite appointment in a wheelchair. *See Setlock*, 56 A.3d at 906, 912. The *Setlock* Court reasoned the resident agreement contained a broad arbitration clause, but the clause "only applie[d] to causes of actions arising from issues governed" by the resident agreement. *Id*. at 912. The *Setlock* Court continued, "Nowhere in said agreement is there a clause governing the standard of medical care to be provided by [the facility's] employees." *Id*. *Setlock*, however, must be read according to the facts of that case. *See Lance v. Wyeth*, 85 A.3d 434, 453 (Pa. 2014) (stating that "it is axiomatic that the holding of a judicial decision is to be read against its facts") (citation omitted). In *Setlock*, the plaintiff's claims involved alleged breaches of standards of medical care when providing ancillary transportation services to a resident. By contrast, in the present case, appellees' claims related directly to Barclay's provision of accommodations, room, and maintenance called for under the Agreement and the crux of the Agreement was the offer and acceptance of those services at the Woolman, a licensed personal care facility. Therefore, *Setlock* is distinguishable and does not support the trial court's ruling.

ignored a critical term and its interpretation of the Agreement, which would have required a list of every safety provision the parties reasonably expected a licensed personal care facility to meet, cannot stand.

Moreover, the arbitration clause in paragraph 34 of the Agreement stated: "Any controversy or claim arising out of, or relating to, this Agreement, or the breach thereof, will be settled by arbitration, which will be binding upon both parties."  Agreement, ¶ 34.  Our courts construe broadly the "any controversy or claim" language in an arbitration clause.  *See Borough of Ambridge Water Auth. v. Columbia*, 328 A.2d 498, 501 (Pa. 1974) (describing the "any controversy or claim" language as the "broadest conceivable language" which evidenced the parties' intent that the scope of arbitration was "unlimited"); *Smay v. E.R. Stuebner, Inc.*, 864 A.2d 1266, 1276 (Pa. Super. 2004) (concluding similar language "must be read broadly to include all claims arising from the contract regardless of whether the claim sounds in tort or contract"); *accord Waters v. Express Container Servs. of Pittsburgh, LLC*, 284 A.3d 1217, 1225 (Pa. Super. 2022) (holding that personal injury claims arising out of work the plaintiff performed under an equipment lease and transportation agreement fell within the broad scope of a clause requiring arbitration of a "controversy or claim" related to "operations" under the agreement).  The arbitration clause here contained no limiting or restricting language.  *Compare Waters*, 284 A.3d at 1225 (discussing a broad arbitration clause), *with Midomo Co., Inc. v.*

***Presbyterian Hous. Dev. Co.***, 739 A.2d 180, 187, 189 (Pa. Super. 1999) (interpreting an arbitration clause expressly limited to certain situations). The arbitration clause in paragraph 34 is "unlimited" as to the subject matter set forth in the Agreement.

In sum, the arbitration clause in paragraph 34 broadly applied to claims arising out of or relating to the Agreement. Appellees' claims against Barclay for failing to enforce its no-smoking policy, maintain a proper flow of water to the Woolman's sprinkler systems, and ensure the Woolman's fire suppression systems were in working condition fell within the terms of the Agreement to provide a room and accommodations pursuant to the applicable governmental regulations required to be licensed. Accordingly, we conclude that appellees' claims arose out of or related to Barclay's duties under the Agreement, and we reverse the trial courts' orders to the extent they held that appellees' claims did not fall within the scope of the Agreement and the Agreement's arbitration clause.

Lastly, we note that the trial courts in the DiLoreto and Rauenzahn actions did not address Barclay's remaining preliminary objections to compel arbitration or appellees' responses thereto. Accordingly, we vacate the orders to the extent they overruled all preliminary objections. We remand for further proceedings to consider the remaining issues raised by the parties in their preliminary objections and responses thereto, including whether enforcement of the arbitration clause on claims of reckless conduct would violate public

policy and whether the former residents bound their estates to arbitrate all damages sought. The trial courts are free to consider any further legal arguments necessary to render an appropriate decision on these outstanding issues.

Orders reversed in part and vacated. Cases remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/17/2023